COMPENSATION DEPARTMENT OF DISTRICT FIVE, UNITED MINE WORKERS OF AMERICA, Appellant,

v.

Ray MARSHALL, Secretary of Labor, Donald Ellisburg, Assistant Secretary of Labor, Employment Standards Administration, Ralph Hartman, Director, Office of Workers' Compensation Programs, James R. Yocum, Associate Director, Division of Coal Mine Worker's Compensation Programs, Francis A. Demarino, Acting Chief, Branch of Claims Determination and The Department of Labor, Appellees,

and

Bethlehem Mines Corporation, Consolidation Coal Company, the Pittston Group, Westmoreland Coal Company, Old Republic Insurance Company, Republic Steel Corporation and the North American Coal Corporation, Nacco Mining Company, Quarto Mining Company, Intervenors-Appellees.

No. 81–1633.

United States Court of Appeals, Third Circuit.

Argued Nov. 9, 1981.

Decided Dec. 9, 1981.

Margaret D. Blough (argued), United Mine Workers of America, Dist. 5, Compensation Dept., Pittsburgh, Pa., for appellant.

Robert J. Cindrich, U. S. Atty., Pittsburgh, Pa., Stuart E. Schiffer, Acting Asst. Atty. Gen., Anthony J. Steinmeyer, Stanley E. Alderson (argued), Attys., U. S. Dept. of Justice, Washington, D. C., for defendants-appellees; Cornelius Donoghue, Jr., Acting Associate Sol. for Employee Benefits, Dept. of Labor, Joseph M. Walsh, Counsel for Claims, Dept. of Labor, Washington, D. C., of counsel.

Charles M. Surber, Jr. (argued), Jackson, Kelly, Holt & O'Farrell, Charleston, W. Va., for intervenors-appellees.

Before SEITZ,* Chief Judge, GARTH, Circuit Judge, and POLLAK,** District Judge.

## OPINION OF THE COURT

GARTH, Circuit Judge.

This is an appeal from an order of the district court for the Western District of Pennsylvania which dismissed an action brought by the Compensation Department of District Five, United Mine Workers of America ("District Five") against the Secretary of Labor. District Five sought to enjoin the Secretary from rereading X-rays of black lung claimants, contending that the Secretary's practice violated § 413(b) of the Black Lung Benefits Act, 30 U.S.C. § 923(b). We agree with the district court's determination that it lacked subject matter jurisdiction over this action. We therefore affirm its dismissal of District Five's complaint.

## I.

### A.

The Black Lung Benefits Act ("BLBA"), 30 U.S.C. §§ 901 *et seq.*, provides that miners who are totally disabled by black lung disease (pneumoconiosis) are entitled to benefits which are paid either by an individual mining company or from the Black Lung Disability Trust Fund, to which mining companies contribute periodically. *See* 30 U.S.C. §§ 932(b), 934, 934a. The Secretary of Labor processes claims for these benefits filed after December 31, 1973, unless an adequate state workers' compensation law applies.[1] 30 U.S.C. §§ 931, 932.

Briefly stated, the processing of black lung claims begins with an initial determination of the claimant's eligibility for black lung disability benefits by a deputy commissioner, an official of the Division of Coal Mine Workers' Compensation Programs within the Office of Workers' Compensation Programs. The deputy commissioner also determines whether there is a mining company (an "operator") which is liable for payment of any benefits due the claimant. After the operator has had an opportunity to rebut the claimant's evidence, the deputy commissioner issues a proposed decision and order. From that order an appeal may be taken to an administrative law judge ("ALJ"), who holds a hearing to which the

---

* Although Chief Judge Seitz was a member of the panel at oral argument, he subsequently recused himself and did not participate in the decision of this case.

** The Honorable Louis H. Pollak, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

1. Because the Secretary has not found any state workers' compensation scheme to be adequate, all BLBA claims filed after December 31, 1973, are still handled by the Secretary of Labor.

claimant, the operator, and the Office of Workers' Compensation Programs, among others, are parties. Once the ALJ issues his order, any dissatisfied party may then appeal to the Benefits Review Board ("BRB"), which is "authorized to hear or determine appeals raising a substantial question of law or fact." 33 U.S.C. § 921(b)(3). *See generally* 20 C.F.R. §§ 725.350–.483. Finally, any party dissatisfied with the BRB's disposition of the case "may obtain a review of that order in the United States court of appeals for the circuit in which the injury occurred." 33 U.S.C. § 921(c).[2]

### B.

■ In establishing eligibility for black lung benefits, various types of evidence are considered, including

> medical tests such as blood gas studies, X-ray examination, electrocardiogram, pulmonary function studies, or physical performance tests, and any medical history, evidence submitted by the claimant's physician, or his wife's affidavits, and in the case of a deceased miner, other appropriate affidavits of persons with knowledge of the miner's physical condition, and other supportive materials.

§ 413(b) of the BLBA, 30 U.S.C. § 923(b).[3] The use to which X-rays may be put in passing upon a claim, however, is specifically governed by § 413(b). First, the statute provides that "no claim for benefits . . . shall be denied solely on the basis of the results of a chest roentgenogram." *Id.* Second, the statute requires that the Secretary accept the interpretation of the X-ray rendered by a radiologist *on behalf of the claimant,* so long as (1) there is other evidence of pulmonary or respiratory impairment, (2) the X-ray was taken by a radiologist or qualified technician, and the radiologist interpreting it is board-certified, (3) the X-ray is of adequate quality, and (4) there is no reason to believe that any fraud is being committed.[4]

It is the meaning of the second restriction—requiring the Secretary to accept the interpretation of the X-ray rendered by the claimant's radiologist—that has given rise to the underlying dispute between District Five and the Secretary of Labor. District Five contends that § 413(b) forbids the Secretary from engaging in any "substantive" rereading of X-rays whatsoever—that is, reading of X-rays for any purposes other than to verify the quality of the X-ray. The Secretary of Labor, on the other hand, contends that the requirement that the Secretary, under certain circumstances, "accept" the interpretation of a board-certified radiologist binds only the Secretary and his agents, and not the ALJ or the BRB. Further, the Secretary asserts that § 413(b) in no way forbids the substantive rereading of X-rays. *See* Government's Brief at 40–46.

Thus, before this suit was filed, it appears that an X-ray submitted by a claimant was

---

2. Much of the statutory scheme for both administrative and judicial review of benefits determinations under the BLBA is borrowed from the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901, *et seq.* For a general description of the relationship between the two acts, see *Krolick Contracting Corp. v. Benefits Review Board,* 558 F.2d 685 (3d Cir. 1977).

3. The present version of § 413(b) was enacted as §§ 5(a)–5(c) of the Black Lung Benefits Reform Act of 1977, P.L. 95–239 (March 1, 1978), 92 Stat. 97.

4. In any case in which there is other evidence that a miner has a pulmonary or respiratory impairment, the Secretary shall accept a board certified or board eligible radiologist's interpretation of a chest roentgenogram which is of a quality sufficient to demonstrate the presence of pneumoconiosis submitted in support of a claim for benefits under this subchapter if such roentgenogram has been taken by a radiologist or qualified technician, except where the Secretary has reason to believe that the claim has been fraudulently represented. In order to insure that any such roentgenogram is of adequate quality to demonstrate the presence of pneumoconiosis, and in order to provide for uniform quality in the roentgenograms, the Secretary of Labor may, by regulation, establish specific requirements for the techniques used to take roentgenograms of the chest. 30 U.S.C. § 923(b). For the regulations establishing the requirements for the techniques used in taking X-rays, see 20 C.F.R. § 718.102; Appendix A to Part 718 of 20 C.F.R.; 20 C.F.R. § 727.206.

routinely referred to a "B-reader," a physician qualified in diagnosing black lung disease from X-rays, see 20 C.F.R. § 718.-202(a)(1)(ii)(E). The B-reader would examine the X-ray not only to ensure that it was "of adequate quality to demonstrate the presence of pneumoconiosis," 30 U.S.C. § 923(b), but also to arrive at his own independent conclusion as to whether the X-ray indicated the presence of black lung disease. While the B-reader might, of course, agree with the interpretation of the claimant's radiologist, he might also conclude that an X-ray in fact revealed no black lung disease at all. In those circumstances, while the Secretary of Labor acknowledged that the Office of Workers' Compensation Programs was bound by the positive interpretation of the X-ray submitted on behalf of the claimant, see 20 C.F.R. §§ 718.202(a)(1)(i), 727.206(b)(1), the Secretary interpreted § 413(b) to bind neither the ALJ nor the BRB. As a result, the B-reader's negative rereading was made available to the operator for use as rebuttal evidence at the hearing before the ALJ, who could credit the B-reader's negative interpretation over the positive diagnosis of the claimant's radiologist.[5]

Seeking to prevent the Secretary from substantively rereading the X-rays in those circumstances where § 413(b) requires the Secretary to "accept" the interpretation of the claimant's radiologist, District Five filed a complaint and a motion for a temporary restraining order and a preliminary injunction on December 31, 1980. Although

the district court denied the motion for a temporary restraining order, it granted the motion for a preliminary injunction on January 13, 1981. Subsequently, the district court allowed a number of operators to intervene as defendants under Fed.R.Civ.P. 24(b).

### C.

On February 11, 1981, the district court ruled that it lacked subject matter jurisdiction over District Five's action. The district court observed that the BLBA and applicable regulations provide for an adjudication process by which "claims are processed by a Deputy Commissioner, appeals are taken to an Administrative Law Judge, further appeals are taken to the Benefits Review Board and appeals from Board decisions are taken to the appropriate Circuit Court of Appeals." App. 360. Moreover, the district court noted, the BLBA specifically provides for federal district court jurisdiction "in only two very narrow cases," both involving enforcement orders against operators. Id. at 361.[6]

Reasoning that the form of review provided in a statute is ordinarily intended to be exclusive, the district court inferred from this scheme that Congress did not intend the district courts to have subject matter jurisdiction to grant the relief that District Five sought. Thus the district court dissolved the preliminary injunction and dismissed the complaint with prejudice. It did not pass on the merits of District Five's allegations.[7]

---

**5.** Under the Secretary's interpretation of § 413(b), moreover, the BRB, in reviewing the ALJ's decision, could take the B-reader's negative interpretation into account in determining whether "substantial evidence in the record considered as a whole," 33 U.S.C. § 921(b)(3), supported the ALJ's finding.

**6.** If an operator fails to pay an award of disability benefits for which he is liable, the successful claimant or the Secretary may bring an action in district court to enforce the order. See 33 U.S.C. § 921(d). Moreover, the Secretary may bring an action to enforce a lien against an operator who fails to make payments to the Black Lung Disability Trust Fund. 30 U.S.C. § 934(b)(4)(A). See also 33 U.S.C. § 918 (collection of defaulted payments).

**7.** District Five had asserted other bases for jurisdiction, but the district court correctly found all avenues of nonstatutory review precluded or otherwise unavailable. Jurisdiction was not available under 28 U.S.C. § 1331 (federal question jurisdiction) because it was "supplanted by the provisions for exclusive Court of Appeals review." App. 361. The district court also correctly held that review was not available in this case under 5 U.S.C. § 702 (the review provision in the Administrative Procedure Act) or 28 U.S.C. § 1361 (mandamus). App. 365. See Grant v. Hogan, 505 F.2d 1220, 1225 (3d Cir. 1974) (APA does not provide independent basis for jurisdiction, and mandamus not available where there exist adequate administrative remedies); Loveladies Property Owners Ass'n,

After the dismissal was ordered, the Director of the Office of Workers' Compensation Programs issued a set of "Temporary Instructions Covering X-ray Rereading." *See* Addendum to Government's Brief, *reprinted as Appendix to this opinion, infra.* These instructions, dated February 19, 1981, were based on a ruling of the BRB, issued on February 6, 1981, in the case of *Tobias v. Republic Steel Corporation* (80–1114–BLA), involving the same dispute over the meaning of § 413(b) as District Five had raised in its complaint in district court. In *Tobias,* which is discussed more fully below, the BRB rejected the Secretary's interpretation of § 413(b) and in large part adopted District Five's position. As a result, the instructions of February 19, 1981, though still directing that all X-rays be substantively reread by the B-readers, now require that if the limitations of § 413(b) apply, a B-reader's negative interpretation must be placed in a sealed envelope and not be made available to the operator or any other party, the ALJ, or the BRB.[8]

On March 30, 1981, District Five appealed from the district court's dismissal of its complaint.

## II.

■ The central issue in this case is whether subject matter jurisdiction over District Five's complaint exists in the district courts. We hold that it does not, because we agree with the district court that the scheme of review established by Congress for determinations of black lung disability benefits was intended to be exclusive. Thus, the proper method for contesting the Secretary of Labor's interpretation of § 413(b) is to exhaust the administrative remedies provided under the statute and

then to seek review, if desired, in the court of appeals, rather than to seek an injunction against the Secretary in district court.

Underlying our conclusion that the district court lacked subject matter jurisdiction is the general rule that if "there exists a special statutory review procedure, it is ordinarily supposed that Congress intended that procedure to be the exclusive means of obtaining judicial review in those cases to which it applies." *City of Rochester v. Bond,* 603 F.2d 927, 931 (D.C.Cir.1979). Moreover, "there is a strong presumption against the availability of simultaneous review in both the district court and the court of appeals." *Sun Enterprises, Ltd. v. Train,* 532 F.2d 280, 287 (2d Cir. 1976). Because Congress has specifically provided for a statutory scheme whereby claims must first be decided administratively and then reviewed in the courts of appeals, with jurisdiction expressly provided for in the district courts only in specific, limited circumstances, our analysis begins with a presumption that the district court lacked subject matter jurisdiction over this action. We look then to whether an examination of the statute's legislative history, purpose, and design reveals circumstances appearing in this case which are sufficient to overcome that presumption.

## A.

In making that examination, we find *Whitney National Bank v. Bank of New Orleans & Trust Co.,* 379 U.S. 411, 85 S.Ct. 551, 13 L.Ed.2d 386 (1965), to provide especially useful guidance. There, the Federal Reserve Board ("FRB") decided after hearing to allow Whitney National Bank to organize a holding company which would

---

430 F.Supp. 276, 282 (D.N.J.1975) (same), *affirmed without opinion,* 547 F.2d 1162 (3d Cir. 1976), *cert. denied,* 432 U.S. 906, 97 S.Ct. 2949, 53 L.Ed.2d 1077 (1977). *See also Memphis Trust Co. v. Board of Governors,* 584 F.2d 921, 924–25 (6th Cir. 1978).

Because the district court found that it had no subject matter jurisdiction, it did not pass on the issue of District Five's standing, which had been raised by the Secretary and the intervenors.

8. Under these instructions, the occasions for use of a B-reader's negative interpretation apparently arise only when the B-reader concludes, for example, that even though the claimant may not have black lung disease, the X-ray reveals that he suffers from another respiratory ailment such as lung cancer. In such a case, the claimant or his physician is notified.

establish a bank in a nearby county; all that remained to be done was for the Comptroller of the Currency to issue a certificate of authority for the new bank. Among other actions taken, some competing banks filed suit in the District Court for the District of Columbia seeking an injunction against issuance of the certificate of authority by the Comptroller.[9] The district court assumed jurisdiction over this proceeding, and the Court of Appeals for the District of Columbia Circuit affirmed.

On appeal from the D.C. Circuit's affirmance, the Supreme Court held that the district court lacked jurisdiction to issue an injunction against the Comptroller. After first determining that the challenge to the Comptroller's issuance of the certificate raised issues that were properly for the FRB alone to decide, the Supreme Court held that Congress "intended that challenges to Board approval of the organization of a new bank by a holding company be pursued solely as provided in the statute," which provided that the FRB's decisions were to be appealed to the courts of appeals. 379 U.S. at 420, 85 S.Ct. at 557.

Four considerations persuaded the Court to rule as it did in *Whitney*. The first was the general presumption that

> where Congress has provided statutory review procedures designed to permit agency expertise to be brought to bear on particular problems, those procedures are to be exclusive.

*Id.* Thus to allow district courts to pass initially on the propriety of bank holding company arrangements would prevent the FRB from exercising its expertise in the most effective way. *Id.* at 420–21, 85 S.Ct. at 557–58. Second, the Court noted that Congress "has expressly rejected . . . [proposals] for review in these cases in the

district courts." *Id.* at 422, 85 S.Ct. at 558; *see id.* at 419–20, 85 S.Ct. at 556–57. Third, the fact that Congress had not expressly provided for the exclusiveness of the statutory mode of review was not determinative. The Court held that where Congress specifies that certain administrative remedies must be utilized, with review following in the court of appeals, "the doctrine of exhaustion of administrative remedies comes into play and requires that the statutory mode of review be adhered to notwithstanding the absence of an express statutory command of exclusiveness." *Id.* at 422, 85 S.Ct. at 558. Finally, the Court observed, to allow the district courts to assume jurisdiction concurrent with the FRB "would result in unnecessary duplication and conflicting litigation." *Id.*

We believe, as did the district court, (*see* App. 362–63), that *Whitney* presents a closely analogous case to the present one. To begin with, the BRB was created by the 1972 amendments to the Longshoremen's Act as a single appellate body replacing the various district courts to which appeal had previously been available. *See Krolick Contracting Corp. v. Benefits Review Board*, 558 F.2d 685, 687 (3d Cir. 1977). It is true, as District Five points out, that this court has held that it need not defer in all circumstances to the BRB in questions of statutory interpretation. *See Director, Office of Workers' Compensation Programs v. O'Keefe*, 545 F.2d 337 (3d Cir. 1976), *disapproved on other grounds in Director, Office of Workers' Compensation Programs v. Rasmussen*, 440 U.S. 29, 99 S.Ct. 903, 59 L.Ed.2d 122 (1979).[10] Still, important purposes are served by refusing to pass on an "argument with far-reaching implications for [the BLBA] . . . without the benefit of . . . [the BRB's] expert evaluation." *Director, Office of Workers' Compensation*

---

9. Other competitors sought a reconsideration of the FRB's ruling, which was denied. They subsequently appealed to the Court of Appeals for the Fifth Circuit, pursuant to 12 U.S.C. § 1848.

10. In *O'Keefe*, this court held that neither the Director of the Office of Workers' Compensation Programs nor the BRB was entitled to

deference in deciding the question whether a statutory maximum limit on benefits applied to persons in plaintiff's situation. The BRB was not entitled to deference, *O'Keefe* held, because it is a purely appellate body "presented with select cases and [is] not an agency involved in the overall administration of the statute." 545 F.2d at 343.

*Programs v. North American Coal Corp.,* 626 F.2d 1137, 1143 (3d Cir. 1980). *See* 33 U.S.C. § 921(b)(1) (BRB's members are to be "appointed by the Secretary from among individuals who are especially qualified to serve"). Allowing the BRB to pass initially upon important issues provides for a much greater likelihood of uniformity and effectiveness in the administration of the BLBA than would allowing actions to be brought in the various district courts throughout the country. Further, piecemeal determination of claims is avoided. In contrast, if at every point in the administrative process at which a claimant (or District Five, seeking to represent the claimant), believed that the BLBA was not being followed in some respect, that claimant could file an action in district court for an injunction—rather than raise the alleged violation of the statute on administrative appeal—the resulting duplication of review and the disruption of orderly and uniform administrative interpretation could have an adverse effect on implementation of the BLBA.[11]

Second, the various actions taken by Congress in establishing the present structure by which black lung benefits are reviewed strongly suggest a Congressional intent to oust the district courts from jurisdiction over claims for benefits, except as specifically provided in the statute. As noted earlier, the 1972 amendments to the Longshoremen's Act, which created the BRB, eliminated the provisions for district court review of benefits claims. Even more telling, Congress rejected a proposed section in the Black Lung Benefits Reform Act of 1977 which would have allowed claimants to seek review of benefits determinations in the district courts.[12]

Third, in providing for review of BRB determinations in the court of appeals, Congress in effect required, as it did with respect to · approvals of new banks, that a claimant exhaust all administrative remedies before seeking judicial review. There would have been little if any point in creating an entity such as the BRB if it could be circumvented at will by the bringing of an action in a district court against the Secretary.

Fourth, we note that the circumstances of this appeal present precisely the same danger of duplicative and conflicting litigation as faced the Supreme Court in *Whitney,* when it rejected a collateral attack brought in the district court against the Comptroller. Had the Court held otherwise,

> [s]ome opponents might participate before the [Federal Reserve] Board; others might well wait for termination of the Board's activities and then sue in the district courts for an injunction accomplishing the same ultimate end. The different records, applications of different standards and conflicting determinations that would surely result from such duplicative procedures all militate in favor of the conclusion that the statutory steps provided in the Act are exclusive.

*Whitney, supra,* 379 U.S. at 422, 85 S.Ct. at 558.

As noted earlier, here the BRB and the district court were simultaneously being requested to decide the very same issue—the proper interpretation of § 413(b). Had the district court assumed jurisdiction and decided adversely to the claimants, there would have been two conflicting decisions regarding the scope of the Secretary's powers under the BLBA.

### B.

In deciding, as have other courts when confronted with similar statutory schemes,

---

**11.** *Cf. McKart v. United States,* 395 U.S. 185, 194, 89 S.Ct. 1657, 1663, 23 L.Ed.2d 194 (1969) ("[I]t is generally more efficient for the administrative process to go forward without interruption than it is to permit the parties to seek aid from the courts at various intermediate stages. The very same reasons lie behind judicial rules sharply limiting interlocutory appeals.").

In this respect, we note that in *O'Keefe,* the proper statutory procedures had been followed, and an appeal was taken from the BRB; there was in that case no attempt to bring an action in district court. *See* 545 F.2d at 339.

**12.** *See* House Conference Report No. 95–864, 95th Congress (2d Sess.), at 22–23, reprinted in [1978] U.S.Code Cong. & Admn.News 237, 316.

that the district court lacked subject matter jurisdiction,[13] we do not hold that there are no conceivable circumstances under which a district court would have subject matter jurisdiction over a complaint involving the BLBA. *Cf. Whitney*, 379 U.S. at 423, 85 S.Ct. at 559 (reserving question of whether there might be circumstances in which "the Comptroller [may] be restrained in equity from issuing a certificate to a new bank").[14] If the remedies provided for in the statutory scheme of review are inadequate in a particular case, an argument can be made that Congress did not intend to forbid the district courts from taking jurisdiction.[15] District Five, in fact, contends that the instant case presents just that situation: it sought to enjoin the Secretary from rereading the X-rays, and the BRB cannot issue an injunction against the Secretary. Pointing to the Supreme Court's decision in *Leedom v. Kyne*, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958), District Five concludes that the BRB's inability to grant the injunctive relief that it sought necessitates a holding that the district court had subject matter jurisdiction over the complaint. We find *Leedom v. Kyne* to be clearly distin-guishable from the case *sub judice*, however, and we reject District Five's contention that the remedies available from the BRB with respect to § 413(b) are inadequate.

In *Leedom v. Kyne*, the NLRB violated the express language of § 9(b)(1) of the National Labor Relations Act by certifying a bargaining unit consisting of professional and nonprofessional employees without first taking a vote among the professionals. One of the professional employees then brought an action against the members of the Board in district court, contending that they had acted beyond their statutory powers. The Board, conceding that it had violated the law, argued that the district court lacked jurisdiction, inasmuch as the NLRA provided for review of Board decisions in the courts of appeals and not the district courts. *See* 358 U.S. at 185–87, 79 S.Ct. at 182–83. The district court found otherwise, however, and the Supreme Court upheld the court of appeals' affirmance of the district court. Crucial to the Supreme Court's conclusion that the district court properly assumed subject matter jurisdiction was the fact that, because a certification order is

---

13. *See Nevada Airlines, Inc. v. Bond*, 622 F.2d 1017, 1020 (9th Cir. 1980) (Federal Aviation Act provision for review of FAA actions in court of appeals is exclusive of district court jurisdiction); *City of Rochester v. Bond*, 603 F.2d 927, 931, 934–35 (D.C.Cir.1979) (same for Federal Aviation Act and Federal Communications Act); *Bituminous Coal Operators' Ass'n v. Marshall*, 82 F.R.D. 350, 352–54 (D.D.C.1979) (provision in Federal Mine Safety and Health Amendments Act of 1977 for review in court of appeals of Secretary of Labor's citations, with express provision for district court jurisdiction in only two very narrow instances, indicates intent to deprive district court of subject matter jurisdiction).

14. Similarly, in *McKart v. United States*, 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969), the Supreme Court made it clear, as District Five points out, Brief at 10–11, that the doctrine of exhaustion of administrative remedies is not absolute. There, a draft resister was criminally prosecuted; he tried to assert the defense that he had been wrongfully denied a "sole surviving son" exemption. The lower courts had held him estopped from asserting such a defense, however, on the ground that when the Selective Service had denied him the exemption, he had not taken all administrative appeals. The Supreme Court reversed, holding that exhaustion of administrative remedies was not required in that case.

We believe that the harshness of applying the doctrine of exhaustion in that case, combined with the minimal effect on administration that excusing the requirement was likely to have in view of the criminal penalties that attached to violation of Selective Service laws, *id.* at 197, 199–200, 89 S.Ct. at 1664, 1665–1666, more than adequately distinguish *McKart* from the present case.

15. *Compare Susquehanna Valley Alliance v. Three Mile Island Nuclear Reactor*, 619 F.2d 231, 239–42 (3d Cir. 1980) (finding statutory scheme of review in court of appeals of Nuclear Regulatory Commission action to be inadequate in certain circumstances, and holding that district court has subject matter jurisdiction), *cert. denied*, 449 U.S. 1096, 101 S.Ct. 893, 66 L.Ed.2d 824 (1981), *with City of Rochester v. Bond*, 603 F.2d 927, 935–39 (D.C.Cir.1979) (finding statutory scheme of review in court of appeals of FAA decision adequate to address claimed violations of statute, and thus holding that the district court lacks subject matter jurisdiction).

not a final agency order which can be appealed from the Board to the court of appeals, there was no way to contest the Board's decision to certify the bargaining unit except by bringing an action in district court. *Id.* at 187–88, 79 S.Ct. at 183. Thus, to hold that the district court lacked subject matter jurisdiction would have been to obliterate a right granted by a statute, a result that the Court could not "lightly infer." *Id.* at 190, 79 S.Ct. at 185.

■ Here, in contrast, the BRB is capable of giving the claimants all the relief to which they may be entitled under § 413(b). Indeed, as noted earlier, the BRB itself decided in the *Tobias* case that the Secretary of Labor's interpretation of that section is incorrect, and remanded the case because the ALJ had relied on a negative substantive rereading by a B-reader.[16] In response to *Tobias*, the Director of the Office of Workers' Compensation Programs issued, as previously noted, new instructions providing that where § 413(b) applies, the B-reader's negative interpretation should be entirely removed from the decisionmaking process. *See* Appendix *infra.*

It is true that this is not precisely the relief that District Five sought. District Five sought to enjoin the Secretary from engaging in any substantive rereading at all, whereas the *Tobias* decision and the

instructions of February 19, 1981, leave the Secretary free to conduct the rereadings, but limit the use which may be made of them.[17] It is also true that the Secretary, though acquiescing in the *Tobias* decision, does not concede its correctness, and may challenge it at some point in the future. Nevertheless, so long as the BRB has the power, as it unquestionably does, to reverse an ALJ's claims determination whenever it finds that a violation of § 413(b) has occurred, we fail to understand how the claimants that District Five claims to represent in this case can be said to have suffered any injury from an action taken by the Secretary allegedly in violation of the statute. Moreover, if at some point in the future the BRB reverses itself and adopts the Secretary's interpretation of the statute, the claimant may then appeal to the court of appeals, which, if it finds the statute to have been violated, can remand the case as did the BRB in *Tobias*.[18] If review in the BRB and the court of appeals is thus adequate to remedy any injury to claimants from possible violations of the BLBA, it thereby follows that there is no basis, under *Leedom v. Kyne*, for finding that the district court had subject matter jurisdiction.[19]

### III.

The district court's order of February 13, 1981, dismissing District Five's complaint

16. In ordering the ALJ to reconsider the evidence without the B-reader's diagnosis, moreover, the BRB took an action that it was perhaps not technically compelled to do. In addition to finding that the claimant did not have black lung disease, the ALJ had found that he was not totally disabled. The BRB might thus have chosen to affirm the ALJ on the ground that whatever error there may have been with respect to inclusion in the record of the rereading, the lack of complete disability provided an independent basis for affirming the denial of the benefits. That the BRB did not take this approach is further evidence of the adequacy of the relief available to claimants from the BRB.

17. For this reason we do not consider the appeal to be mcoted by the decision of the BRB in *Tobias* and the issuance of the instructions of February 19, 1981.

18. Of course, we intimate no view as to the merits of either the Secretary's or District Five's interpretation of § 413(b).

19. In view of our holding that the district court lacked subject matter jurisdiction, we do not reach the question, raised by the Secretary and the intervenors, whether the claimants that District Five sought to represent had standing to bring this action.

We note that District Five also argues that the district court should not have granted the operator's motion to intervene under F.R.Civ.P. 24(b) (providing for intervention "when an applicant's claim or defense and the main action have a question of law or fact in common" and "the intervention will [not] unduly delay or prejudice the adjudication of the rights of the original parties"). District Five, however, has not directed our attention to anything in the record that could amount to an abuse of discretion on the part of the district court. Thus we find no error in the grant of the motion to intervene.

for lack of subject matter jurisdiction and dissolving the preliminary injunction, which it had entered on January 13, 1981, will be affirmed.

## APPENDIX

Feb. 19 1981

MEMORANDUM FOR: DCMWC NATIONAL AND DISTRICT OFFICE
DEPUTY COMMISSIONERS AND BRANCH CHIEFS
REGIONAL ADMINISTRATORS AND ASSISTANT REGIONAL ADMINISTRATORS FOR OWCP

FROM: RALPH M. HARTMAN
Director, Office of Workers' Compensation Programs

SUBJECT: Cancellation of Interim Instructions — Temporary Instructions Covering X-ray Rereading

On January 16, 1981 I informed you of the preliminary injunction issued in the case of *Compensation Department of District Five, UMWA v. Marshall* (USDC WD.Pa. No. 80–1870) and issued interim instructions which significantly impacted upon Black Lung program operations.

I am writing at this time to advise you of significant developments since January 16, and to provide you with temporary instructions to be applied to those cases requiring administrative action until the procedure manual can be formally revised to fully reflect resultant procedural changes. (e.g. Chapter 2–501)

On February 6, 1981, a Decision and Order was issued by the Benefits Review Board in the case of *Tobias v. Republic Steel Corporation* (80–1114 BLA) in which it was held to be an error for the Administrative Law Judge to allow a Responsible Operator to place into evidence a rereading by a "B" reader, over the objection of the other party, where the Director was precluded by Section 413(b) of the Act from relying on the rereading.

On February 11, 1981 the court granted the Motion to Dismiss which had been filed by the defendants in the case of *Compensation Department of District Five, UMWA v. Marshall* and dissolved the preliminary injunction.

Based upon these developments, my interim instructions which were issued on January 16 are rescinded and the following temporary instructions are to be immediately implemented:

1. Action on requests by Responsible Operators, or other interested parties, for release of x-ray film(s) for the purpose of re-interpretation, etc. should be honored. In accord with established Division of Coal Mine Workers' (DCMWC) practice, requests must be in writing and must disignate [*sic*] the physician to whom the film is to be sent (Note: Films are released only to physicians.) In the transmittal letter to the physician, the physician should be advised of the identity of the requesting party and the address where the film(s) are to be returned immediately following the reinterpretation. A copy of the transmittal letter should be sent to the requesting party and the other parties to the claim.

2. Each office may resume referral of x-ray film(s) to certified "B" readers (Medical Consultants) in accord with previous DCMWC guidelines. (Note: If the initial reading was by a "B" reader, a quality check is not necessary, except when fraud is suspected.) The "B" readers will continue to use the CM–933 (Rev. March 1979) until a revised form has been approved and printed.

3. Processing of claims at the Deputy Commissioner level may generally resume as provided under the existing procedural guidelines. In so doing, the Deputy Commissioner must, however, take steps to assure that reports of rereadings authorized by the "Director" are limited to a determination of whether the x-ray satisfies the quality standards and whether the x-ray demonstrates the existence of other life-threatening diseases or active diseases requiring treatment, provided the x-ray rereading provisions contained in Section 413(b) of the Act are applicable.

In determining the applicability of Section 413(b), the following guidelines are provided.

a. Section 413(b) limitations do not apply if the rereading by the "B" reader was completed before March 1, 1978.

b. If the initial reading was negative for pneumoconiosis, the Section 413(b) limitations do not apply.

c. For the Section 413(b) limitations to apply, the initial reading report must classify the pneumoconiosis according to one of the accepted international systems. (See 20 CFR 718.102 and 718.202 for films taken on or after April 1, 1980. See 20 CFR 410.428 for films taken prior to April 1, 1980.)

d. The initial' reading must have been interpreted by a physician who was board-certified or board-eligible at the time the film was read for the Section 413(b) limitations to apply.

e. Beginning April 1, 1980, the film must have been taken by a registered radiographic technician for the Section 413(b) limitations to apply.

f. There must be other, independent evidence of a respiratory impairment for the Section 413(b) limitations to apply.

g. The film must be found to be of acceptable quality by a "B" reader for the Section 413(b) limitations to apply.

h. For Section 413(b) to apply, there shall be no reason to believe that the claim has been fraudulently represented.

In determining whether guideline "f" above applies the following guidance is provided. (More detailed instructions will be incorporated in the program manual.)

a. The term "other evidence" should be given the meaning set forth in the applicable regulations. (See 20 CFR 718.202 and 727.206.) In the case of a living miner, "other evidence" means other medical evidence.

b. In determining whether the "other evidence" demonstrates "pulmonary or respiratory impairment["], the following should be considered:

1. It is not necessary for the test results to satisfy the regulatory standards for total disability in order to establish an impairment.

2. If a single valid test or evaluation report demonstrates a pulmonary or respiratory impairment this requirement is satisfied even though there may be conflicting reports contained in the file.

3. Causal relation of the reported pulmonary or respiratory impairment to pneumoconiosis is not necessary to satisfy this requirement.

For purposes of clarity, the following instructions are divided into categories depending on the administrative claims processing stage:

A. *Before an Initial Finding:*

Before the issuance of an Initial Finding, the file will be reviewed to determine whether the Section 413(b) limitations apply. If it is determined that Section 413(b) does *not* apply, the substantive portion (interpretation of pneumoconiosis) of the "B" reader's report will remain in the file and a memorandum to the file will reflect this determination by the deputy commissioner or claims examiner. (See sample, Attachment 1)

If it is determined the Section 413(b) limitations do apply, the "B" reader's report will be photocopied with the substantive portion blocked out, an appropriate certification inserted, and placed in the file. (See Attachment 2) The original "B" reader's report will then be stapled inside the front file cover in a sealed envelope, and will *not* be included in any subsequent exchange of evidence. In addition, the claim file will be referred to a claims examiner who has not seen the substantive portion of the "B" reader's report, for the purpose of further administrative adjudication.

B. *Claims in which an Initial Finding has been made:*

The deputy commissioner or claims examiner will review the file to determine whether

the Section 413(b) limitations apply. If it is determined that Section 413(b) does not apply, the file should be posted as described in paragraph one of "A" above.

If it is determined the Section 413(b) limitations do apply, proceed as described in paragraph two of "A" above. If the claim is ultimately referred to the Office of Administrative Law Judges (OALJ) for a hearing, the file transmitted will not contain the substantive portion of the "B" reader's report. If the elimination of the substantive portion of a rereader's report would result in a change in the previous finding, the parties must be notified and offered a reasonable opportunity to submit additional evidence.

Further instructions will be forthcoming regarding any special handling of claims which had progressed beyond the initial finding stage before issurance [sic] of these temporary instructions.

cc: Mr. Berrington.

\* \* \*

This will certify that the evidence contained in the file has been reviewed, consistant [sic] with Section 413(b) of the Black Lung Benefits Act. It has been determined that the inclusion of the report of rereading by a "B" reader as evidence ·is not barred by Section 413(b).

_____     _____

Name & Title                      Date

Attachment 1
\* \* \*

[The relevant portion of Attachment 2 (Form CM–933, "Roentgenographic Interpretation") to the Memorandum of February 19, 1981, reads as follows:]
\* \* \*

This will certify that this is a true and accurate copy of the report of rereading of the above claimant's chest roentgenogram, with the interpretation for pneumoconiosis and other terms of possible clinical signifi-

cance deleted in accord with Section 413(b) of the Black Lung Benefits Act.

\* \* \*
Attachment 2